Good morning, Your Honors. May it please the Court, my name is Nate Eimer and I'll be representing the appellant, CITGO Petroleum, today. I've asked to reserve five minutes for addressing the Governance Cross-Appeal, if I may. Yes, sir. Thank you, sir. Your Honor, we are appealing here today. This Court has addressed this case before. In 2013, we were before you on an appeal from a $6 million civil penalty that was assessed by the District Court against CITGO for the spill of oil into navigable waters of the United States. This Court affirmed many of the District Court's findings, but it did reverse the penalty, instructed the delaying the expenditures to prevent that spill, and it also asked the Court to reexamine its finding of negligence in light of the evidence that the Court reviewed. On remand, the District Court found that CITGO, in fact, was grossly negligent, not just negligent, and increased the, or it found the economic benefit to be $91 million, and it increased the civil penalty 13 times from what it originally found, the $6 million. It actually went to $81 million in that penalty. We're not appealing here today the finding of gross negligence that we've left behind, but we are appealing on two grounds, the finding of the economic benefit being $91 million. We think there are two clear errors that the District Court committed. The first clear error the Court committed was based on a flawed methodology that the Government's expert employed and that the Court adopted. Both parties agreed that CITGO's economic benefit should be calculated on the basis of CITGO's cost of capital. In other words, the economic benefit the Government viewed and that we understand is appropriate is really sort of the delayed interest, how much money it would have cost CITGO to borrow or obtain the funds necessary to invest in the equipment that ultimately was put in. There's no doubt CITGO put that equipment in eventually, but it saved interest or the cost of obtaining those funds for some period of years. And the question is what interest rate should be used or what rate should be used to value that stream of money that CITGO didn't pay while it didn't obtain those funds. And what rate did you argue should be applied? We argue that it should have been CITGO's borrowing rate, how much money it actually paid to borrow money during that period, which is about 4%, 4.21% in 1996, when most of the equipment should have been installed according to the District Court and according to the Government. The Government used what its expert called the weighted average cost of capital measure, which was far higher. It was two and a half times as high. It was 10.04%. The methodology that their expert, Mr. Harris, used was precisely the methodology that he used in the Allegheny case 13 years before, which went before the Third Circuit. And the methodology was struck down by the Third Circuit as being legally flawed and flawed for basically three reasons that we're challenging the methodology here and saying that Judge Pike could not have adopted it. First, the calculations that Mr. Harris made were not based on the defendant's own data. He used three other companies' data and not ours. He said that the defendant was a privately held corporation and that he used data that was available to him from publicly held corporations. Well, first of all, he had CITGO's borrowing rate. That was available to him. We actually put it into the record. So he used Exxon, Tesoros, and Valeros. He didn't even use their borrowing rate, actually. He made the same mistake even as to them that he did in the Allegheny-Ludlum case. He used an index of what funds of what companies with the same quality of borrowing, B plus or whatever, would have borrowed at. He didn't even use their borrowing rate. But he did have available to him CITGO's borrowing rate. He also testified that he didn't know how to value What was their borrowing rate then? You said he didn't use their borrowing rate? Yeah, we don't know what their borrowing rate was. He didn't say. If the court looks at the record on appeal at 12-873, 877, and 881, you'll see that he didn't use, we don't know what their borrowing rate was. He used an index of various bond funds to see what their borrowing rate might have been. But he doesn't even know what their borrowing rate was. But what he did know was CITGO's borrowing rate. That was put into the record by CITGO. And as I said to Judge Clement, it was 4.2% in the year that the tanks should have been installed, according to the government. Was the rate that he ended up using the rate proposed by the government? Yes, Your Honor. He adopted entirely the rate proposed by the government. And he also adopted entirely all the elements that needed to be added, like the third tank, the fourth tank. Yes, he adopted entirely everything proposed by the government for the economic benefit calculation, even though much of that wasn't necessary. And much of that wasn't even asked for by the government in the criminal case. That included the APS operator and aeration tank. What are those for? What difference would that have made? Those would have made no difference to this bill, Your Honor. And that's part of the reason that we're contesting the second point, which is there was equipment included in that that the government and the court said should have been installed to prevent the spill, which had nothing to do with the spill. All of that equipment, and I would refer the government, the court rather, to a flow chart that's in the record, which is, pardon my glasses, 16983, in which the court will see that all of that equipment that Your Honor just mentioned is downstream from the tanks and would have had no effect on the spill itself. The government itself admitted that So it would have been part of the more effective cleanup? No, Your Honor. Why was it added? That's what I don't understand. I think the government's testimony was that the wastewater treatment system would have worked more efficiently had that equipment been installed. Right. We understood that. That was part of the injunctive relief, and we installed it. We didn't dispute that. We didn't appeal that. We said, all right, if that needs to be done, that's fine. But it had no effect on the spill at all. The government's evidence and the government's lawyers admitted at trial that 20 million gallons basically overflowed our wastewater treatment tanks. And so the question to us and the question we put before this court is the simplest way, the least expensive way of preventing the spill was to provide for 20 more million gallons of storage capacity. And then everyone admits that there would have been no spill, which is the issue here. The violation is the spill into navigable waters. And the debate really is how to provide that extra 20 million gallons of capacity. At the time of the spill, SITCO was in the process of building a third tank that was approximately 10 million gallons of storage. They also had created underneath the tanks what was called a dike or a containment area in case of a spill that was supposed to be all in concrete. But because at the time of the rain event, the third tank was being built, that dike was actually partially demolished in order to provide for construction and an earthen berm was created where the demolition had occurred. That berm partially gave way and the dike didn't fulfill its purpose because it was under construction. Well, plus your other two tanks had gunk in them or something. No question. No question. They had lots of gunk in them. Didn't your people know that? That the tanks were not sufficient? The two tanks that were functioning were not functioning completely? Yes, Your Honor, they knew that. And that's the reason we were grossly negligent in the court's view. But that doesn't diminish or increase the amount of storage capacity that would have been needed to avoid this event. Even with all the gunk in there. We needed the third tank. We needed the third tank and the dike, Your Honor. We needed both. But didn't the expert testify that if you had the three tanks that given the time that would be needed for maintenance with regard to a single tank, you'd then need a fourth tank so that you could have three operating at all times? Wasn't that his testimony? That was his testimony. And that's different than the expert reports that Sitko had. But even still, even if that were the case, that would only have meant we needed two more tanks to avoid the spill. We think that all we needed was the tank and the dike. Sitko's plan was to use that third tank and basically shuttle the three tanks around in dry weather periods in order to clean the other two tanks. That was the plan that was in place at the time. But you agree with me that the government's expert offered testimony that a fourth tank would be needed? Yes, Your Honor. No question. All right. But that still doesn't get us to the other equipment that Judge Clement pointed out in the economic benefit calculation. There was a lot of things that went beyond that fourth tank. So we think all that was needed was the third tank and the dike because that would have given us 20 million gallons of capacity to avoid the spill. The fourth tank might have been nice to have in order to operationally be more efficient, but it wouldn't be necessary to prevent the spill. Nonetheless, the API separator, the aeration tank, the cleaning of the aeration tank downstream, which amounts to tens of millions of dollars in cost that was added onto the economic benefit, none of that was intended to be or is needed for the cleanup of this spill. And that's really the heart of our dispute as well as this interest rate calculation. So if I can return to that for a minute. The Third Circuit said there were three things wrong with the interest rate calculation. It wasn't specific to their Allegheny Ludlam or here, Sitco. It was based on an average over the then eight-year period, here, ten-year period, rather than the time in which the actual purchases had to be made. That didn't happen here. And it didn't calculate the actual cost, the cheapest way of doing it, the marginal cost of capital. All of those problems happen here on the weighted average cost of capital calculation. I know it's more esoteric than just tanks, but it actually amounts to a huge amount of money. The best estimate of how much money this difference makes was given during the trial by our expert, Dr. Finch. He said that if you just change the interest calculation between what Dr. Harris used and what Sitco actually paid for debt during that period, the economic benefit calculation went from the $83 million that the government was asking for at that point down to $14 million just on the changing of the interest rate calculation. It had an almost $70 million change in that value. So that's critical as to what interest rate, because mainly this economic benefit is interest. That's mainly what we're talking about here. And Allegheny Ludlam made it clear that this methodology is absolutely unacceptable because it's not based on this defendant's cost. It's not based on anything. And Mr. Harris didn't give, I admit that, he didn't give a cost of equity for a private company, but that's because he said he didn't know how to do it. He'd never done it. No one had ever asked him to do it. He didn't know about how to go about doing it. But that's not an excuse to use a method that's invalid, and that's exactly what he did. And the government was told 13 years ago in the Allegheny case that he couldn't use this methodology. Not only didn't he use Sitko's debt measure, but the weighted average cost of capital methodology is supposed to use a ratio of how much equity and how much debt a corporation has. He didn't use Sitko's ratio. He used ratios for these three other companies. So he could have used Sitko's, but he didn't. So in every way where he could have used Sitko's data, he didn't. He used third-party data without being able to relate that to Sitko at all, and there was no excuse for his doing that. We also believe that actually not only was the methodology flawed, but under this court's view of having necessary expenditures or the least-cost expenditure, the least-cost way of doing this was to borrow the money. And so that is really the issue here is why couldn't he have used simply Sitko's cost of debt, which was known. That was in the record, which was 4.2% for 1996. In other years it was different amounts, Your Honor, but that table is in the record. And so he could have selected, he, Mr. Harris, could have selected that cost of debt and used that. Now, the government says, well, no, Sitko didn't finance its projects with debt. It financed it with income, and income is the same as equity. But first of all, they didn't find our cost of equity. They could have calculated it, but they didn't. And second, that's a mischaracterization of the testimony that they had, and I'd like to refer the court to Mr. Kent's testimony, which the government, I'm sure, will emphasize. Bob Kent was the vice president of refining at the time he testified at the trial. And if I may, I usually don't read things to the court, but I'd like to read this exchange, if I may, because I think it's really very interesting. He was asked the court how he would finance a tank, he, Mr. Kent, was asked, and he said, in case of a tank, our bank debt was set some years back before, so money was already within Sitko from the bank debt, if you wish, and it might be in the form of cash or something else. And then he goes on and he says, so when we do a project after that, we look at our income and generate income to do the capital projects we need to do. Now, it was unclear what he meant by after that. So the judge followed up, and the government only quotes that last piece about using our income, implying that equity was important to Sitko and that these projects would be financed out of equity. But the court actually was unclear as to what that meant, so it asked another question that the government doesn't quote. And Judge Hike asked, so you say that you do not go and borrow money to buy a refinery. I think he meant a tank. So to increase assets, you take from either the income you have coming in, the profits you have coming in, or the revolver, the revolving loan. And Mr. Kent came right back, and now he was very clear. He said to do a project, it would be from the fixed debt, the bonds, and the bank loans we got. And so that was his answer when he finally made it clear that investments are from the fixed debt, the bonds, and the bank loan. That's what he said. The government also quotes Ms. Savinsky, who was an employee at the Lake Charles Refinery, who was given a capital budget and talked about how the capital budget was allocated. And they like to cite her for another person who says that Sitko would have financed this out of equity, again, a number that the government doesn't know. And they have two quotes from her that they refer to. One is she asks herself, she said, when she's putting the capital budget together, are there any constraints on capital based on earnings? And the government implies from this that the budget is all based on earnings. But no, that's not right. If you lose money, obviously you have less money to invest in capital projects because you have a pool of money that you borrowed from the bank. If you lost money, theoretically you consumed some of those borrowings you have. But then she went on and made it very clear, and the government uses this to characterize its income. She says the pool of money is pretty much determined on cash flow. And cash flow is right. Cash flow is the pool of money that comes in from all sources, not just income. So the bank debt and the bonds that Mr. Kent talked about is all part of the cash flow that comes in. And that's why to us, really, the cheapest way, the least expensive, which is the test that Allegheny uses, the least expensive way for Sitko of financing this is to use debt. And there's no explanation of the record why Sitko couldn't have used debt. I see my time is up. If the Court has any questions, we'll pass. Your time has expired. Thank you, Your Honors. I appreciate it. You have five minutes on the button. Thank you, Your Honor. I'm so interested in that. I didn't notice. Thank you. May it please the Court. John Arbab for the United States. I'd like to start. My intention had been to start with the government's cross-appeal, but because Mr. Eimer talked about a number of parts of his appeal, I'd like to just briefly address them. And if I have time, I can circle back also. First of all, it's not correct that Allegheny of Ludlum rejected the concept of using a whack rate to determine present value of economic benefit. In fact, as this Court pointed out in the prior appeal, citing Allegheny of Ludlum, that case said that there were two possibilities. One is to look at the actual cost of debt, but the second possibility is to look at the actual return on investment of the funds that were not used to invest in pollution control equipment. And that latter actual return on money not spent on pollution control equipment was the government's approach in this case, and it was after hearing all of the evidence between the battling experts, the District Court credited the government's approach, which resulted in a 10 percent rate, not the much lower rate applied by Mr. Finch. Also, with respect to Mr. Kent's testimony that Mr. Eimer referred to, he didn't refer to what we think is the most crucial part of Kent's testimony, which was he said that in his entire tenure at Citgo, which went back to 1999, i.e. only three years from 1996, which was the start date of the economic benefit period, the company had never borrowed money to do projects like this. And the District Court heard that testimony and was entitled to credit it. So the idea that the company would have gone to the bank to borrow money to build the pollution control equipment that it should have had in place prior to the spill, that's just not supported by the record, or at least there's a conflict. The District Court decided to credit the testimony of Kent because he was in an excellent position to know about the company's borrowing practice vis-a-vis pollution control equipment. Now, if I could turn to the— So you say that they really didn't have a borrowing rate, or is that your argument? They didn't. The testimony showed that they didn't borrow money to do these kinds of compliance projects. Where did their borrowing rate come from? They used money that they earned internally through cash flow. That was the testimony, that they would—whatever money CITGO made through its operations, it would use to finance projects. And it had a very high, actually, a very high hurdle rate. According to CITGO's own documents, Mr. Harris checked his 10 percent rate against CITGO's own documents and found out that—I mean, he was comforted that 10 percent was conservative because the company's own documents showed that sometimes they insisted on a 15 percent return rate in some of the relevant years. In one of the relevant years, it was as high as 59 percent. So 10 percent, as the judge found, looked very reasonable and conservative compared to those other higher rates that were from CITGO's own documents. So where did opposing counsel get the borrowing rate that he quoted this morning? Well, Finch did talk about cost of debt, but the judge found that that was not a reliable way of determining the interest rate here, mainly for the reason I just pointed out. The company did not borrow money to build things like large storage tanks or necessary treatment equipment. And there are other problems— To restate, to make sure that I understand, there's a methodology which would focus on what it would have cost them to borrow the money to make the improvements that would have avoided the violation. And then the other is—a different approach is to look at what the return is on what was saved by not making the improvements. Exactly, Your Honor. And the government took the latter approach. The district court heard the former approach from Mr. Finch and decided that given all of the testimony and evidence, that the government's approach through its witness was more credible and believable. Now if I could turn to one other aspect of Mr. Imert's presentation, which was the concept that only a third tank was necessary to avoid the spill and therefore economic benefits should have been based only on the cost of a third tank. I think the court can look at two or maybe three pages in the record to see why that argument is just not valid. First of all, on remand, in its remand brief to the district court, at record page 8187, Sitko said that a reasonable approximation of the least cost means of preventing the spill comes to $7.2 million. Now the critical thing here is not the number, but what Sitko was including when it came up with the $7.2 million number. And for that, I would refer the court to page 8185 of the record, which also is behind tab one of the government's record excerpts. There the $7.2 million number is explained in a chart on that page under least cost options. It's the third of the three options on that chart, and it includes lots of other things besides just a third tank. This is Sitko itself making its presentation to the district court on remand. If you look at the chart and also footnote three, you have a third tank, you have one caustic neutralization unit, two API separators, dissolved gas flotation unit, and upgrade aeration tanks, fine bubbler diffusers. This is all much more than a third tank only or even a third tank plus the paved dike proposal. And as it turned out, the district court selected a much narrower subset of items than Sitko was saying is supported by the record. So the third tank only argument, it's contrary to Sitko's litigating position below. It's contrary to what Sitko was saying is supported by the record and is what we would accept. And the third page, which is behind tab two of the government's record excerpts, sort of summarizes in a chart, a chart prepared by Sitko. It lists all of these items, delayed capital costs. There are multiple things under that column, including third stormwater tank, but many others. There's also delayed expenses, a list of them. There's also avoided operation and maintenance expense. All of these things go far beyond a third tank only concept. I might also point out two things with regard specifically to the idea of the third tank only plus a paved berm would have been the least cost way of preventing the spill. At a pretty fundamental level, there's just serious arithmetic problems with this. First of all, we have to remember that the company would regularly take out of service one of the tanks for maintenance. So if you only had three tanks, you'd be back down to a two-tank scenario, which is exactly what led to the spill. You also have the government's expert, Mr. Amendola, testifying about why four tanks, not three, were part of the least cost alternative to avoid the spill, in his view. And the district court credited Mr. Amendola's testimony on this point. I think probably the pithiest part of his testimony can be found at record 14714 to 15. Now let's look at a couple of the arithmetical assumptions that are wrong. There's an assumption that the third tank would have had 10.7 million gallons of capacity, but that's overstated. The testimony from Mr. Amendola showed that the standard operating procedure for Sitco was to empty the tanks into the dike before the overflow level was reached. In other words, they wouldn't let the oily wastewater get all the way to the top of the tank. And for three tanks, that standard operating procedure removed about 1.5 million gallons of capacity. That's at record page 14652. Another problem here is that a third tank would not have had the full 10.7 million gallons capacity because we know that Sitco allowed sludge and gunk, as Judge Clement said, to build up in the tanks. And I think we should give Sitco the benefit of the doubt that if it had had the third tank online, it would not have made the 30 million gallons of discharges that it made to the unpermitted surge pond. So those 30 million gallons would have had to go somewhere. I think it's fair to say that a lot of the 30 million gallons would have ended up in a third tank had it been built at the time, and the company would not have been checking the amount of sludge in the third tank either, just like it didn't with the first two. Another problem with a third tank only scenario is that it assumes that the concrete dike would have had 11.8 million gallons of capacity. But we know that's not right because the testimony of Mr. Mendele at record 14653-54 established that the dike had 1.6 million gallons of rainfall in it during the storm event because it was raining. And you have to take into account the 1.6 million gallons that were not available to hold waste because they were already taken up by rainfall. Now, let me turn to the government's cross appeal. Our main point here is quite straightforward, Your Honors, and that is if you look at the prior appeal, the court said that the purpose of the economic benefit penalty factor is, quote, to recoup any benefit gained by the polluter in failing to comply with the law, unquote. And the court in the prior appeal also explained what economic benefit means in this context when the court said generally courts consider the economic benefit to the offender of delaying capital expenditures and maintenance costs on pollution control equipment. That is the test that the district court applied when it reasonably determined that the company gained $91.7 million in economic benefit. But contrary to the recouping principle that I just mentioned, the court without explanation set the penalty considerably below the economic benefit level. The penalty was $81 million, but that's almost $11 million below the amount that the court found was Sitko's economic benefit. It does not recoup. $81 million obviously does not recoup $91.7 million. Another problem is that in the prior appeal, the court described economic benefit as a floor that can be adjusted in other ways. But clearly $81 million does not treat economic benefit as a floor. The floor would be $91.7 million, and you would adjust upward from there. But in no event is $81 million a floor when the economic benefit is almost $11 million higher. It doesn't have to be the same. Your Honor, the case law is quite clear that in civil penalty cases, the amount of the penalty generally needs to be greater than the amount of economic benefit to promote the deterrence and punishment and leveling the playing field objectives of the civil penalty. And the problem here is compounded because, as Mr. Imert mentioned, the district court on remand found that Sitko had been grossly negligent in allowing this catastrophic oil spill. So the idea that in a gross negligence case you would have a penalty that's below economic benefit without any explanation just does not make sense. Here, taking the uncontested aggravating factors under penalty statute, the penalty should have been considerably more than the amount of economic benefit. You have uncontested findings that this was a catastrophic, tragic oil spill, that Sitko's gross negligence, gambling with the environment, as the Court put it in the previous appeal, had led to this catastrophic event. You have the judge's findings on remand about the very negative, the very bad history of compliance. But he also found that they were extremely effective in pursuing the cleanup effort, so I think he must have weighed those factors in considering whether to use the ceiling or the floor. Yes, Your Honor. The judge did consider that, and it would, in our view, it would be within the judge's discretion to not impose the maximum penalty based on that mitigating factor. But mitigation can only take you so far in a gross negligence case. There's no, except for one outlier case that we discussed, the Laidlaw case, there's no precedent for a below economic benefit penalty. The case is all uniformly recognized that economic benefit, that a penalty needs to be greater than the amount of economic benefit. And even this Court made the, in Cedar Point, Boyle, recognized that there could be a limited situation where an equal, an only equal to economic benefit penalty would be within the Court's discretion. But that was based on the fact that the district court found the defendant in that case could not afford to pay anything more than economic benefit. But it certainly doesn't justify going below economic benefit, particularly, as I said. So you're conceding that there are some circumstances which could justify going below that amount? I think it would be an extraordinary situation, Your Honor. As I said, in Cedar Point, the Court signed off on an equal to economic benefit. The district court said in its order, it said, upon consideration of the totality of the circumstances and the full analysis of the factors set forth herein, and then he went, he held a per barrel penalty amount of $1,500 times 54,000 barrels. And that's how he got to his $81 million. Yes. Is that right? That's right, Your Honor. What's wrong with that? We don't know. There's several things wrong with it. First, we don't know the maximum for a gross negligence case was $4,300 per barrel. We don't know. The judge doesn't tell us why $1,500 was selected. That's way below $4,300. Well, he says he looked at the totality of the circumstances. You're just saying he's required to tell you what that is. Part of our problem with the $81 million penalty is that it's not explained. But that's not the only thing wrong with the penalty in the government's view. The principal thing that's wrong with it is given all of the judge's aggravating findings, including gross negligence and the finding of $91.7 million in economic benefit, this is a case that cries out for a penalty that's in excess above economic benefit, not below. I just don't understand how one could justify in a gross negligence case a below economic benefit penalty. Perhaps another way of quantifying this or getting a feel for it is that the $81 million penalty in a gross negligence case, with all of the additional aggravating statutory factors that the judge himself found, this penalty is only 35 percent of the statutory maximum. Now, we're not saying that the judge had to give the statutory maximum, which would have been $232 million. Actually, the government suggested that some mitigation of the maximum would be warranted if the court was so inclined. But there's just nothing here that justifies, given the court's own factual findings, a below economic benefit penalty. $81 million is far below, is almost $11 million below the economic benefit of $91.7 million. Do you offer what you would deem an appropriate amount? Yes. On remand, the government's penalty request was $197 million out of $232 million maximum penalty in a gross negligence case. And the government gave an explanation for why it thought a moderate amount of mitigation would be warranted. But the court didn't offer any explanation for why this drastic below economic benefit mitigation was done. And as I've been indicating, the case law is uniform, that the economic benefit needs to exceed, I'm sorry, the penalty needs to exceed the amount of economic benefit. Otherwise, there's no deterrence. Polluters are, in effect, here CITGO is, in effect, saying it's fine to benefit to the tune of $11 million from violating the Clean Water Act. And that's not the kind of message that we should be sending. I see that my time is almost up. If there are no further questions, I would just summarize by saying that as to CITGO's appeal, the government requests that the $91.7 million economic benefit finding be affirmed. And as to the government's cross-appeal, the government requests that the $81 million penalty be vacated and remanded with instructions that the court enter a new penalty in excess of $91.7 million and explain with some particularity, as the court said in the prior appeal, how the factual findings. Can we do that on appeal, or do we have to remand the case? No, that should be remanded to you, Your Honor. The district court should enter a new penalty in excess of $91.7 million, and the district court should explain with some precision, as the court said in the prior appeal, how the district court's facts led to the new penalty amount. And I'm out of time. Thank you, Your Honor. Thank you, sir. Mr. Emmer? Just a few points. In answer to your question, Judge Graves, I heard the government is saying that their methodology was basically to calculate the amount earned on the money that CITGO saved. That is not their methodology, at least that's not the way I understand it. In their brief on remand, page 13, that was record 8030, they described their methodology as calculating the cost of the capital. So that's essentially the borrowing rate or the cost of the equity. That's what the weighted average capital cost is. It's not the money that was earned by CITGO. There are the two alternatives, but that's not the one they chose in that. Also, as to Mr. Kent's testimony, what Mr. Kent testified was that CITGO didn't, in his experience from 1999 forward, take out a specific loan for a specific project. What he talked about was CITGO having a massive borrowing, tens if not hundreds of millions of dollars that was borrowed. And that's why in the testimony I read, he was talking about the pool of cash that was available from these bond issues that were already issued, and they would use those for projects like this. That's why he testified that they take it out of the borrowings. Also- He said that CITGO typically didn't borrow money for projects like this. Is that just incorrect? No, he testified that they didn't do a loan for a project. So I go out and buy a house. I go out and get a mortgage for my house. What CITGO does, it had bond issues and long-term debt that it would just create in general and mortgage basically its assets. And so instead of having a mortgage on my house, it's as though I took out a long-term loan for $500,000 separately on a personal note, and then I drew into that $500,000 to buy my house. That's the way CITGO financed its projects. Is that where you derive your borrowing rate? Yes, Your Honor. It's from this system-wide debt? Exactly, Your Honor. Layers of, okay. Yeah, it's exactly the way the rate was determined from these long-term debts and the bond issue. And that is in the record somewhere? Yes, Your Honor. Yes, Your Honor. I can give you the site in a moment, if that's okay. Okay. Also, as to these alternatives, what CITGO did in the trial court was to show Judge Hike that you could take a whole different mix of equipment and still come out with numbers much lower than the government did. And so that's the reason it used these different variations. In fact, CITGO expressly said that to the court in its briefs when the government made the point that somehow CITGO was advocating all of this. And in its presentations, basically, and this is on remand, the surreply brief filed by CITGO at page 4. It's a record at site 10032. CITGO said, no, no, no, no, you misunderstand why we're citing all this equipment. We're citing it because, Judge, you could take almost any combination of equipment you want and still come out with a much lower number than the government's coming up with. And it's not as though CITGO created this idea of the third tank and the berm out of whole cloth. It's actually what the government insisted CITGO do in the environmental compliance plan that the government made CITGO sign when it pled guilty to the criminal charges. So in that environmental compliance plan, the government required CITGO to complete the third tank, and the government made CITGO finish the dike and put a diversion valve in the dike so that it would not have the same spill again. In the environmental compliance plan, when CITGO pled guilty, the government didn't ask for a fourth tank. The government didn't say a fourth tank was needed to avoid the spill. The government only said a third tank in the dike was needed, and that's why CITGO has continuously insisted that only that was necessary, because that was the government's position in the criminal case. If I can talk a little bit about the government's cross appeal, I think, Judge Clement, you're exactly right. There were lots of mitigating factors here that Judge Hike found, including what the Congress said was a critical factor, which was the speed and efficacy of the cleanup. Judge Hike found that to be exceptionally effective and gave it exceptional credit. But no one should think that CITGO got off here making money out of this. There was no economic benefit to CITGO, no matter how you slice it. Judge Hike found basically $70 million in costs to CITGO from this. He found a $13 million criminal penalty was paid. There was $16 million in unreimbursed cleanup costs. There was $7 million in implementing the environmental compliance plan, $30 to $40 million in injunctive relief. He ordered a $3 million penalty to the state. That's $70 million. So that alone takes half of the government's penalty. Now we're almost at, if you take the penalty entirely, that's $150 million. If you take half the penalty, we're at $140 million, $110 million. So the combined cost of this to CITGO far exceeds any calculation of the economic benefit. And so CITGO is not walking away from this situation having made money because of its negligence or gross negligence. CITGO is far, far in the hole as a result of this episode. Thank you. Thank you, Your Honor. Yes, Your Honor.